# EXHIBIT A

MASTER DOCKET NO.  2020-28545

| | | |
|---|---|---|
| IN RE JANE DOES CASES | § § | MDL CIVIL COURT |
| MDL NO. 19-0991 | § § | HARRIS COUNTY, TEXAS |

**********************************************

CAUSE NO. 2018-12747

| | | |
|---|---|---|
| JANE DOE #4 | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| vs. | § | |
| | § | 11th JUDICAL DISTRICT |
| SALESFORCE.COM, INC., | § | |
| BACKPAGE.COM, LLC, G6 HOSPITALITY, | § | |
| LLC and NNJP LLC D/B/A MOTEL 6 | § | |
| | § | |
| *Defendants.* | § | HARRIS COUNTY, TEXAS |

**PLAINTIFF'S THIRD AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

Comes Now, Jane Doe #4 Plaintiff in the above-styled and numbered cause and files this Third Amended Petition complaining of SALESFORCE.COM, INC., BACKPAGE.COM, LLC G6 HOSPITALITY, LLC and NNJP LLC D/B/A MOTEL 6, as Defendants, and respectfully shows the Court as follows:

## I.   SUMMARY OF CASE

1.    Sex trafficking is a public health crisis that has hit epidemic proportions in our communities, resulting in a devastating effect on its survivors and a crushing financial effect on our world. In 2019, Governor Abbot formally declared sex trafficking a public health crisis in Texas.[1]

---

[1] https://capitol.texas.gov/tlodocs/86R/billtext/pdf/HC00035F.pdf#navpanes=0

2.     Estimates are that in 2016 there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide, including 4.8 million people trapped in sexual exploitation.[2]

3.     The exploitation of victims of sex trafficking and prostitution most often does not occur solely at the hands of the traffickers and sex buyers. Rather, technology companies and hotels often play an equal hand in the exploitation of these victims.

**The Role of Big Tech**

4.     Formerly, the sale of sex occurred face to face. If a buyer wanted to purchase sex, they would have to leave their home or hotel, locate the victim and conduct the transaction in person. With the development of technology, that is no longer the case. Technology has transformed the commercial sex trade, and, in the process, has contributed to the explosion of domestic sex trafficking and compelled prostitution.

5.     Backpage was the leading online marketplace for the sale of sex and sex trafficking prior to being seized by the FBI in April of 2018. "Shutting down the largest online U.S. marketplace for sex trafficking will dramatically reduce the profitability of forcing people into the commercial sex trade, at least in the short term," said Bradley Myles, chief executive of Polaris, an international anti-slavery group that runs the National Human Trafficking Hotline.[3]

6.     The National Association of Attorneys General described Backpage as a "hub" of

---

[2] INT'L LABOUR OFFICE, *Global estimates of modern slavery: Forced labour and forced marriage*, at 9, 38, https://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf.
[3] https://www.reuters.com/article/us-usa-backpage-justice/sex-ads-website-backpage-shut-down-by-u-s-authorities-idUSKCN1HD2QP

"human trafficking, especially the trafficking of minors." [4]

7.      During 2013-2015, Backpage earned over 99% of its revenue from adult ads, a substantial percentage of which came directly from on-line prostitution and sex trafficking.[5]

8.      Salesforce, a technology company, is undisputedly one of the world's greatest technology innovators, creating powerful and effective tools that have revolutionized business function and growth.

9.      In public, and on various social media platforms, Salesforce has boasted about fighting human trafficking. In reality, however, Salesforce owned and controlled the CRM platform on which Backpage operated. Additionally, Salesforce supplied Backpage with the specialized tools, support, and technical expertise needed to operate and grow its on-line selling of sex and sex trafficking business including Jane Doe #4 and others.

10.     Salesforce has operated beyond the law while fighting any and all efforts to hold them accountable for their wrongful conduct, even in the face of the extraordinary efforts required to address the public health crisis they helped create.

11.     Technology companies can no longer divorce themselves from the technologies they create and platforms they control when they are being used in an unlawful, harmful, and costly manner.

12.     Technology companies should no longer escape liability for assisting, developing, and facilitating the growth of the unlawful selling of sex.

---

[4] See https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/News/Press_Releases/2011/NAAG_Backpage_Signon_08-31-11_Final.pdf, and the press release at https://www.atg.wa.gov/news/news-releases/attorneys-general-backpagecom-prove-you-re-fighting-human-trafficking
[5] https://oag.ca.gov/system/files/attachments/press_releases/signed%20dec%20for%20arrest%20warrant%20pdf_Redacted.pdf (at *11).

**The Role of the Hotels**

13.     Sex trafficking and the sexual exploitation of trafficking victims is a rampant and well-known problem in the hotel industry.

14.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[6]

15.     It has long been recognized that exploiters and traffickers use hotel and motel rooms when setting up "dates" between victims of sex trafficking and those individuals purchasing sex.

16.     In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[7]

17.     The United States Department of Homeland Security established the Blue Campaign to end sex trafficking.[8]

18.     In a recent Blue Campaign bulletin, the Department of Homeland Security outlines that traffickers have long used the hotel industry as a hotbed for sex trafficking.

19.     Some of the recommended policies and procedures recommended by the Blue Campaign include learning to identify warning signs and indicators of sex trafficking. Warning signs identified in the recent Blue Campaign bulletin include, but are not limited to:

      a.     patrons paying for a room with cash or a pre-paid credit card;

      b.     other guests lingering outside a hotel room for long periods of time;

      c.     non-guests coming and going from the premises;

      d.     minors paying for hotel rooms; and

---

[6] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune, April 2019, https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.
[7] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hotel Industry, Cornell Hotel Report, October 2015, https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.
[8] https://www.dhs.gov/blue-campaign.

e.      traffickers using other victim's identities to book rooms.

20.     These recommended policies and procedures are intended to reduce sex trafficking. Traffickers have long capitalized on the hotel industry's refusal to adopt companywide anti-trafficking policies, such as the ones proposed by the Department of Homeland Security's Blue Campaign, refusal to train staff on what to look for and how to respond, failure to establish a safe and secure reporting mechanism, and they have exploited the seclusion and privacy of hotel rooms.

### The Solution

21.     Fortunately, Texas was among the first states to follow the Federal Government's lead in recognizing that actors other than actual traffickers and johns, were participating in, promoting, facilitating, and benefitting from the selling of sex and sex trafficking.

22.     To hold traffickers and the facilitators and promoters of prostitution responsible, the Texas legislature enacted Chapter 98 and 98A of the Texas Civil Practice and Remedies Code, a provision that allows Jane Doe #4 to bring claims against all who participated, promoted, facilitated, or benefitted from her trafficking.

23.     Both Chapter 98 and 98A seek to hold those who engage in and those who benefit from prostitution and sex trafficking accountable to the resulting victims. While Chapter 98 focuses on the "trafficking of persons" and 98A is directed to prostitution and the promotion of prostitution specifically, both causes of action focus on conduct that constitutes an underlying criminal offense.

24.     Chapter 98 and 98A are to be liberally construed and applied to promote their underlying purpose to protect persons from human trafficking/compelled prostitution and provide adequate remedies to victims of human trafficking/compelled prostitution. [9]

---

[9] Tex. Civ. Prac. & Rem. Code Ann. § 98.006 and § 98A.006.

25.     The criminal justice system has been bearing the cross in the fight against the selling of sex and sex trafficking for far too long by prosecuting the traffickers, prostitution promoters, and sex buyers.  It is now time for the civil justice system to hold those who profit from this sex trafficking and prostitution industry accountable for their wrongful conduct.

26.     For these reasons, and with great strength and courage, Jane Doe #4 brings suit under Chapter 98 and 98A and related causes of action.

## II.     DISCOVERY CONTROL PLAN

27.     Jane Doe #4 intends to conduct discovery pursuant to Texas Rule of Civil Procedure 190.4 (Level 3).

## III.     JURISDICTION AND VENUE

28.     Venue is proper in this Court pursuant to Texas Civ. Prac. & Rem. Code 15.002 because all or a substantial part of the events giving rise to this lawsuit occurred in Harris County, Texas.

29.     Jane Doe #4's damages are in excess of $1,000,000.00.

## IV.     PARTIES

### A.     PLAINTIFF

30.     Plaintiff Jane Doe #4 was at all relevant times a trafficked person as that term is defined in Texas Civil Practice and Remedies Code Chapter 98. Jane Doe #4 is a resident of Harris County, Texas. Given the nature of these allegations, this complaint identifies Jane Doe #4 as "Jane Doe #4 or Jane Doe" throughout. She may be contacted through her lead counsel, whose information is contained below.

31.     There is a collective and compelling interest in keeping Jane Doe #4's identity anonymous.

B.    **BACKPAGE**

32.    Backpage.com, LLC ("Backpage") is a Delaware Limited Liability Corporation registered to do business and doing business in Texas with its principal place of business in Dallas, Texas. Backpage has been served and made an appearance herein**.**

33.    All references to Backpage include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Backpage now or at any time relevant to the claims herein.

C.    **SALESFORCE**

34.    Salesforce.com, Inc. ("Salesforce") is a foreign corporation organized under the laws of Delaware with its principal place of business in California. Salesforce does business in Texas and is registered to do business in Texas. Salesforce has been served and made an appearance herein.

35.    All references to Salesforce include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Salesforce now or at any time relevant to the claims herein.

D.    **G6 HOSPITALITY**

36.    G6 Hospitality LLC is a for-profit Delaware Corporation with its principal place of business in Carrolton, Texas.

37.     At all relevant times, G6 Hospitality maintained its nerve center in Texas, was authorized to do business in Texas, and derived substantial revenue from the Texas Marketplace. G6 Hospitality, LLC have members who reside in Texas. G6 Hospitality has been served and entered an appearance in this case.

38.     All references to G6 Hospitality include any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Backpage now or at any time relevant to the claims herein.

### E.     NNJP LLC D/B/A MOTEL 6

39.     NNJP LLC d/b/a Motel 6 is a for-profit Texas Limited Liability Corporation doing business in Texas. As a limited liability corporation, NNJP LLC shares citizenship with each of its members, all of whom are Texas residents. NNJP LLC d/b/a Motel 6 has entered an appearance in this case.

40.     All references to NNJP includes any department, division, office, agency, subsidiary, or corporate affiliate whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority and implied/apparent authority), employee, person, firm, or corporation acting on behalf of Backpage now or at any time relevant to the claims herein.

### V.     RULE 28 ASSUMED OR COMMON NAME

41.     Jane Doe #4 brings this petition against each Defendant in their assumed or common name and expressly reserves the right under Texas Rule of Civil Procedure 28 to substitute the true name of any Defendant if needed or in response to Court Order.  Moreover, Jane

Doe #4 expressly invokes the right to amend under the doctrine of misnomer if any Defendants have been properly served but were done so under the wrong legal name.

## VI.   FACTS REGARDING BACKPAGE AND SALESFORCE

**A. Sex trafficking hits epidemic proportions in the United States as a direct result of the internet, specifically Backpage.**

42.    Estimates are that by 2016, there were as many as 40.3 million victims of human trafficking and sexual exploitation worldwide. Int'l Labour Office, *Global estimates of modern slavery:Forced labour and forced marriage*, at 9, 38,  https://www.ilo.org/wcmsp5/groups/public/---dgreports/-- dcomm/documents/publication/wcms_575479.pdf

43.    Historically, sex trafficking and prostitution took place out on the street. Now, most sex trafficking, including the trafficking of Jane Doe #4, occurs online.

44.    With the development of modern technology, pimps and traffickers can reach entirely new audiences, evade law enforcement detection and maintain control of victims by transporting them quickly between locations thus maximizing profits far beyond traditional trafficking methods.

45.    Backpage, as early as 2008, had been publicly identified by law enforcement, United States Attorneys General and every United States Governor as the biggest and most notorious sex trafficking and prostitution promoting website in the United States.

46.    The National Association of Attorneys General described Backpage as a "hub" of "human trafficking, especially the trafficking of minors."[10]

47.    In 2013, Backpage did not have the ability to scale and operate an international sex-trafficking and sex-selling hub without operational support, marketing innovation, and guidance. Backpage sought a partnership that would assist the vision of its growth as the leader in online sex

---

[10] https://www.hsdl.org/?view&did=797979

sales as well as concealing such activity including the moving of its operations offshore to evade law enforcement.

48.     In late 2013, Salesforce knowingly entered into business with Backpage and made possible the exponential growth of Backpage's business, sex trafficking and the selling of sex.  The relationship lasted until April 2018 when the Justice Department led the effort to seize Backpage.

49.     Salesforce will claim they were dealing with a Backpage affiliate and not with Backpage directly; however, at all relevant times, Salesforce knew it was working directly with Backpage through communications with Backpage executives and exchanging correspondence with Backpage at its business address and email addresses (@backpage.com) and taking money directly from Backpage.

50.     During all relevant times, Salesforce knew Backpage was in the business of selling sex through prostitution and the sex trafficking of minors and adults including Jane Doe #4.

51.     Any examination of Backpage's internet operations and business needs or even a simple Google search would have established Backpage was in the business of the online selling of sex through compelled prostitution and the trafficking of persons.

52.     Salesforce's interactions with Backpage through its initial interviews, scope of work analyses, onboarding, integration and continued support and control of the platform provided Salesforce with actual knowledge regarding the details of Backpage's operation.

**B.     Backpage and Salesforce knowingly participated and received a benefit from prostitution, the promotion of prostitution, and sex trafficking.**

53.     Salesforce created and owned the technology used by Backpage to grow and expand its internet based online selling of sex, sex trafficking and compelled prostitution including the trafficking of Jane Doe #4.

54.     Salesforce did not sell an off the shelf product, but rather sold a subscription program that granted access to its' technology, products, support and service.

55.     Salesforce sold Backpage access to several products and features including, but not limited to, Salesforce's premier level product - the Enterprise Edition - and Pardot - an advanced marketing technology.

56.     Backpage was unable to integrate and migrate it's data without assistance.

57.     Rather than bringing in a third party integrator, Salesforce personally assisted Backpage with the integration and migration of it's data onto the Salesforce CRM technology platform.

58.     Salesforce retained ownership and control of the platform and technology utilized by Backpage to promote, develop and grow its internet based online selling of sex, sex trafficking and compelled prostitution including that of Jane Doe #4.

59.     As set forth in the binding Master Service Agreements applicable to the time period Backpage was a customer, Salesforce retained the right to delete or restrict access to Backpage's data or platform if the actions or content of the user was found to be unlawful or tortious.  Further, Salesforce retained complete ownership of its technology and products as specifically set forth in the contracts with Backpage.

60.     Salesforce provided access to unique technology tools and instruments to Backpage as part of its internet based online selling of sex, sex trafficking and compelled prostitution including the trafficking of Jane Doe #4.

61.     Salesforce provided ongoing operational support for the technology tools and instruments that made it possible for Backpage to engage in the internet based on-line selling of sex, sex trafficking and compelled prostitution including the trafficking of Jane Doe #4.

62.    Backpage used Salesforce's technology to both facilitate and promote the selling of sex and sex trafficking.

63.    As pleaded above, Salesforce knew Backpage used its technology to promote and facilitate the selling of sex and sex trafficking. Thus, Salesforce, by accepting funds from Backpage, economically benefitted from the trafficking of Jane Doe #4 and the thousands of other trafficking victims Backpage exploited.

64.    During initial negotiations on or about November 6, 2013, a Certified Salesforce Consulting Partner met with Backpage CEO Carl Ferrer and another high-level Backpage executive for introductions and to assess and evaluate Backpage's needs and goals. The Consulting Partner reported back to a Salesforce executive in an e-mail on November 7, 2013 that he "spent most of the time learning of [Backpage] as a business," noting the need for security and advanced integration.

65.    On or about November 12, 2013, an in-house Salesforce Account Executive confirmed ongoing conversations with the Backpage executives and was confident that the partnership would soon be consummated stating "I think this is trending strongly in our favor."

66.    From inception, Salesforce inherently understood that the need for security was tantamount and met this need by providing the tools necessary for Backpage to evade legal and regulatory authorities during the period Jane Doe #4 was trafficked. This independent action of Salesforce constitutes the facilitation and promotion of prostitution and the facilitation of sex trafficking.

67.    Each time a new application was purchased, support requested, or contract renewed, Backpage consulted with Salesforce to assess its operational needs. This occurred, at a

minimum, on the following dates:  November 12, 2013; November 16, 2016; December 13, 2016;
January 28, 2017; and April 27, 2017.

68.     At any one of those dates, Salesforce, as the owner with retained control over the
platform, had the ability to literally pull the plug on Backpage's prostitution and sex trafficking
operations.

69.     In e-mail correspondence, an in-house Salesforce executive confirmed that
Backpage's needs would be best served by Salesforce's Enterprise CRM edition. As described on
its website, the Enterprise edition is "fully customizable," providing a "deeply customizable sales
CRM for [Backpage]'s business" of prostitution and sex trafficking.

70.     By promoting the selling of sex and sex trafficking, Backpage made its money
directly from traffickers and the sellers of sex.  Backpage used that money to continue its purchases
and subscriptions with Salesforce.

71.     Through the use of Salesforce's tools and instruments, Backpage's business
exponentially grew requiring the scope of work covered by the Salesforce contract to grow as well
with the purchasing of additional licenses, data storage and other Salesforce features.

72.     At all relevant times, Salesforce knew it was working directly with Backpage
through communications with Backpage executives and exchanging correspondence with
Backpage at its address and email addresses.

73.     At all relevant times, Salesforce retained ownership, management and ultimate
control over Backpage's platform and data.

74.     In 2015, Backpage was under intense public scrutiny surrounding the credit card
companies' refusal to process their transactions due to the nature of Backpage's business.

Backpage was in fear of imminent law enforcement seizure necessitating the need for a duplicate copy of the Backpage system for use overseas.

75.     Salesforce's ongoing and continuous relationship with Backpage endured several nationwide law enforcement efforts, multiple civil lawsuits against Backpage, and a U.S. Senate investigation.

76.     After Backpage's income decreased due to the absence of seamless credit card processing, Salesforce agreed to alter Backpage's payment structure in an attempt to help them stay afloat as they searched for solutions.

77.     At all relevant times, Salesforce knew it was participating in and benefitting from a sex trafficking venture and from the promotion of prostitution. For example, Backpage's CEO, Carl Ferrer, was arrested in Texas on October 6, 2016, for pimping underage children.[11] A month later, on November 17, 2016, Salesforce renewed its contract with Backpage, with Carl Ferrer signing the agreement.

78.     Salesforce's relationship with Backpage ended on April 13, 2018 only after the U.S. Department of Justice seized Backpage.

**C.     Jane Doe #4 is compelled into prostitution and trafficked on Backpage during its relationship with Salesforce.**

79.     Between February 15, 2014 and February 20, 2014, Jane Doe #4, who was a minor at all material times, was sold for unlawful sex acts by any means in Houston, Texas.[12]

80.     The compelled prostitution and trafficking of Jane Doe #4 was made possible by the technology tools, operational support, and platform provided by Salesforce.

---

[11] https://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-announces-criminal-charges-against-senior
[12] Texas Penal Code 43.05(a)(2) and Texas Penal Code 20A.02(a)(7).

81.     Jane Doe #4's trafficker paid money to Backpage to post ads selling Jane Doe #4 for sex.  Ads were paid for and posted on Backpage including, but, not limited to the following times:

    a.  On Monday, February 17, 2014 at 11:28 PM for $12.00

    b.  On Tuesday, February 18, 2014 at 5:34 AM for $12.00

    c.  On Tuesday, February 18, 2014 at 6:03 PM for $12.00

    d.  On Tuesday, February 18, 2014 at 9:41 PM for $12.00

    e.  On Tuesday, February 18, 2014 at 5:19 AM for $12.00

    f.  On Thursday, February 20, 2014 at 6:02 AM for $12.00

    g.  On Thursday, February 20, 2014 at 8:36 AM for $12.00

82.     Jane Doe #4 was caused by any means into prostitution and sex trafficking by the acts of Backpage and Salesforce both jointly and independently.

83.     Jane Doe #4 suffered significant physical and emotional injuries as a result of the trafficking and/or compelled prostitution complained of herein

## VII.   FACTS REGARDING G6 HOSPITALITY AND NNJP

**A.     Sex trafficking and the sexual exploitation of trafficking victims is a rampant, well-known problem in the hotel industry.**

84.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[13]

---

[13] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

85.    For years, sex trafficking ventures have brazenly and openly operated out of hotels throughout this country, and those trafficking ventures have "been able to reap these profits with little risk when attempting to operate within hotels."[14]

86.    In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[15]

87.    Hotels have been found to account for over 90% of commercial exploitation of children.[16]

88.    According to the Polaris Project, one of the most commonly reported venues for sex trafficking to the National Human Trafficking Hotline is hotels and motels.

89.    It has long been recognized that exploiters and traffickers use hotel and motel rooms when setting up "dates" between victims of sex trafficking and those individuals purchasing sex.

90.    As stated in a publication by Cornell University on the issue, "the hospitality industry is undoubtedly involved in the sex trafficking industry … and therefore have an inherent responsibility to deter the crime and can be liable for failing to do so."

91.    The ease of access and anonymity of hotels has led to an explosion in child sexual exploitation nationwide.

92.    While these statistics are staggering, the hotel industry chooses to ignore these atrocities because more room rentals translate to more profits for the hotels.[17]

---

[14] *See Human Trafficking in the Hotel Industry*, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post, June 2016, http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victims-life_us_57714091e4b0f168323a1ed7

[15] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report, October 2015, at https://scholarship.sha.cornell.edu/cgi/vi ewcontent.cgi?article=1222&context=chrpubs Oct. 2015

[16] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[17] Robert Mandelbaum, *Rooms Department Operations*, Hospitality Net, Mar. 23, 2007, available at

93.     At limited service hotels and extended stay hotels, room rentals alone account for 97% of the total revenue of the hotel while room rentals at full service hotels averages 68% of total revenue.[18]

94.     The United States Department of Homeland Security established the Blue Campaign to end sex trafficking.[19]

95.     A recent Blue Campaign bulletin, concludes that traffickers have long used the hotel industry as a hotbed for sex trafficking and recommends policies and procedures that the industry can implement to help prevent sex trafficking and the sexual exploitation.

96.     Some of the recommended policies and procedures include learning to identify warning signs and indicators of sex trafficking.

97.     Warning signs identified in the recent Blue Campaign bulletin include, but are not limited to:

        a.      patrons paying for a room with cash or a pre-paid credit card;

        b.      other guests lingering outside a hotel room for long periods of time;

        c.      non-guests coming and going from the premises;

        d.      minors paying for hotel rooms; and

        e.      traffickers using other victim's identities to book rooms.

98.     These recommended policies and procedures are intended to reduce sex trafficking.

99.     G6 Hospitality has Motel 6 franchises all over the country, with at least 1,400 various locations around the United States.[20]

---

https://www.hospitalitynet.org/opinion/4030758.html (noting that room rental primarily drive profits, not other amenities such as food and drink purchases, spa services, restaurants and other in-room entertainment services)
[18] *Id.*
[19] https://www.dhs.gov/blue-campaign
[20] https://g6hospitality.com/about-us/#our-locations

100.    G6 Hospitality's hotels are "strategically located throughout the U.S. — close to airports, freeways and other thoroughfares"[21] making them an ideal venue for sex trafficking and compelled prostitution.

101.    G6 Hospitality controls every aspect of the Motel 6 franchise.

102.    This control begins with the contractual control outlined in the franchise agreement and the day-to-day control as provided in the rules provided by G6 Hospitality.

103.    Taking a hands-on day-to-day control of daily operations, G6 Hospitality dictates location, internal décor, design of the franchise, security, marketing, pricing of all services, hiring and firing requirements, training of employees, point of sale systems, insurance, and uniforms of employees.

104.    This day-to-day control over the operations of the franchisee includes training and supervision of the employees providing services and every aspect of the services provided at each franchise.

105.    This day-to-day control includes training related to the booking of rooms.

106.    This day-to-day control includes training related to the recognition of signs of human trafficking, including but not limited to those set forth in the Blue Campaign Bulletin above.

107.    This control over the franchisee and the day to day operation of the facility continues for the life of the franchise.

108.    G6 Hospitality also requires the use of uniform branding, including a universal website linking all the franchises in one location.  The control by G6 Hospitality is so pervasive, the franchisee is not an independent contractor and any assertion otherwise is nothing more than a sham and subterfuge.

---

[21] https://g6hospitality.com/our-brands/#about-motel-six

109.    G6 Hospitality's hotel, located at 19606 Cresswood Court Spring, Texas is branded as a G6 Hospitality Hotel.

110.    Guests of G6 Hospitality expect consistency among hotel locations.

111.    Guests of G6 Hospitality are told each G6 Hospitality branded hotel complies with standards and branding of G6 Hospitality. G6 Hospitality had actual authority over the operation of NNJP's hotel, located at 19606 Cresswood Ct Spring, Texas.

112.    G6 Hospitality had apparent authority over the operation of NNJP's hotel, located at 19606 Cresswood Ct Spring, Texas.

113.    G6 Hospitality exercised its actual and apparent authority to control the day-to-day operations at NNJP's hotel, located at 19606 Cresswood Ct Spring, Texas.

114.    NNJP is and was at all material times required to comply with franchise agreement standards, policies and rules, including those related to security, kidnapping, the trafficking of persons and/or compelled prostitution, if any, promulgated by G6 Hospitality.

115.    G6 Hospitality is liable for the acts of its franchisees when it exerts day-to-day control over its franchisees.

116.    G6 Hospitality generates revenue and profit from each room that is rented.

117.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by G6 Hospitality.[22]

---

[22] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

118.    G6 Hospitality's loyalty program allows for a faster and easier booking process and direct access to deals, including a 10% discount on the best available nightly rate.[23]

119.    G6 Hospitality requires its franchisees to adhere to consistent standards.

120.    G6 Hospitality exercises control over its franchisees to ensure quality control by conducting annual on-site inspections to confirm its policies and procedures are complied with.

121.    G6 Hospitality exercises control over decisions related to payment options for rooms, including but not limited to allowing payment by cash or pre-paid credit card.

122.    G6 Hospitality exercises an ongoing right of control over its hotels, including but not limited to NNJP's hotel, located at 19606 Cypresswood Court Spring, Texas, through at least one or more of the following actions:

    a.  hosting online bookings on G6 Hospitality's domain;

    b.  requiring G6 Hospitality branded hotels to use G6 Hospitality's customer rewards program;

    c.  setting employee wages;

    d.  making employment decisions;

    e.  advertising for employment;

    f.  sharing profits;

    g.  standardized training methods for employees;

    h.  building and maintaining the facility in a specified manner;

    i.  standardized or strict rules of operation;

    j.  regular inspection of the facility and operation;

    k.  fixing prices;

    l.  security policies and procedures;

---

[23] https://login.my6.com/#/home

  m. interior and exterior design decisions; and/or

  n. other actions that deprive G6 Hospitality's branded hotels of independence in their business operations.

**B. Jane Doe #4 was repeatedly exploited in G6 Hospitality and NNJP's Motel 6.**

123. In February of 2014, Jane Doe #4 was repeatedly trafficked and compelled to commit prostitution at the G6 Hospitality and NNJP's Motel 6 location at 19606 Cypresswood Court Spring, Texas, while a minor.

124. Jane Doe's trafficker used the Motel 6 located at 19606 Cypresswood Court Spring, Texas to traffic Jane Doe #4 because he knew members of the staff looked the other way.

125. The people who worked there knew or should have known that Jane Doe #4 was staying at their property and recognized unusual and suspect conduct surrounding her stay.

126. More specifically, upon information and belief, the following signs of sex trafficking were readily present at the Motel 6 located at 19606 Cypresswood Court Spring, Texas:

  a. Excessive single male traffic by non-patrons entering and exiting the hotel;

  b. Increased male foot traffic and lingering non-patrons lined in hallways;

  c. Jane Doe's trafficker paying for rooms with cash or pre-paid cards; and

  d. Other signs of sex trafficking.

127. These signs would, at a minimum, provide requisite knowledge of trafficking to NNJP, but G6 Hospitality also knew or should have known of trafficking at its branded hotels, including the Motel 6 at 19606 Cypresswood Court Spring, Texas.

128. In order to meet quality standards, G6 Hospitality receives and reviews complaints submitted through its customer service e-mail guestrelations@g6reservations.com and toll-free number 1-866-703-4589.

129.    In order to meet quality standards, G6 Hospitality routinely receives reviews and complaints submitted by patrons on various travel websites, including but not limited to google.com, travelocity.com, priceline.com, booking.com, orbitz.com, expedia.com, yelp.com, and others.

130.    By 2014, G6 Hospitality knew well that it's franchisee hotels were being used for sex trafficking and compelled prostitution.  Scores of news stories from across the US, highlight G6 Hospitality's facilitation of such conduct, and certainly establishes that G6 Hospitality knew, or should have known, of the use of its hotels for sex trafficking.[24] Among notable press involving the frequent use of G6 Hospitality's hotels for illegal activity, the following was noted:

a.  "Authorities are crediting a 14-year old girl with helping break up a human trafficking operation in San Jose… officers rushed to the 14-year old's location, a Motel 6 at 2560 Frontaine Road… In addition to the teen, officers rescued a pair of women from California, ages 20 and 23…";

b.  "Police said they arrested two people involved in sex trafficking…. This happened at a Motel 6 in Nashville; [the trafficker] would bring people to the Motel 6… to have sex with the victim."

c.  "Police in Warwick are hoping to clean up criminal activity at a Motel 6 in the city… Within the last few days, three people were charged with manufacturing crystal meth at the motel and another man was arrested for sex trafficking… Police have made a total of 75 arrests there in the past year,"

d.  "Great Falls police have arrested a man and woman they say promoted prostitution of an underaged girl. … a Great Falls detective and a Homeland Security agent received information that a man was at the Motel 6 in Great Falls with a juvenile female… being used for prostitution.;" and

e.  "A Motel 6 in Sylmar will have stricter guest registration requirements and beefed up security as part of a $250,000 settlement with the of Los Angeles City

---

[24]https://www.mercurynews.com/2019/05/30/courageous-teen-helps-break-up-san-jose-human-trafficking-operation/ (May 30, 2019; San Jose, California); https://www.wwlp.com/news/2-arrested-after-human-trafficking-operation-near-nashville-preschool/ (February 9, 2020; Nashville, Tennessee); https://www.wpri.com/news/police-taking-close-look-at-warwick-motel-6/ (March 24, 2015; Warwick, Rhode Island); https://nbcmontana.com/news/local/police-arrest-man-woman-both-18-for-human-trafficking (June 20, 2015; Great Falls, Montana); https://www.dailynews.com/2017/08/31/motel-6-pays-la-250000-in-settlement-over-prostitution-gangs-and-drugs-at-sylmar-property/ (August 31, 2017; Los Angeles, California)

Attorney… the location had become a hub for drug sales, prostitution and gang activity,"

131.   This sampling of news stories involving G6 Hospitality franchisee locations establish that G6 Hospitality knew:

    a.  The use of G6 Hospitality properties for sex trafficking was not isolated to one Motel 6;

    b.  The use of G6 Hospitality's properties for sex trafficking was not isolated to G6 Hospitality in one specific geographic region;

    c.  The common use of G6 Hospitality's properties for sex trafficking was a nationwide problem that stemmed from decisions at the top;

    d.  G6 Hospitality hotels were involved with multiple law enforcement investigations involving sexual exploitation;

    e.  The use of G6 Hospitality hotels for sex trafficking was occurring nationwide;

    f.  Sex trafficking generally and specifically at G6 Hospitality hotels inherently involved compelled prostitution; and

    g.  G6 Hospitality failed to ensure proper policies and procedures were in place and being followed to prevent sex trafficking and compelled prostitution.

132.   Additionally, G6 Hospitality knew that at all times relevant to the allegations herein, sex trafficking was occurring on G6 Hospitality branded properties through publicly available online review websites such as google.com, travelocity.com, priceline.com, booking.com, orbitz.com, expedia.com, yelp.com, and others, which are regularly reviewed by companies such as G6 Hospitality. Online reviews show the pervasiveness of customer reported sex trafficking on G6 Hospitality branded properties and G6 Hospitality's failure to address, limit or prevent sex trafficking and compelled prostitution at its branded properties for example:

- Regarding an October 2017 stay at a Motel 6 in Albany, New York, a customer wrote: "I would not recommend staying at this Motel 6… we were greeted by gang-bangers and what looked to be several prostitutes hanging about going from room to room."[25]

- Regarding an August 2019 stay at a Motel 6 in Tallahassee, Florida, a customer wrote: "…drug addicts prostitute it was horrible I will never go back and I would never send anybody to Motel 6 on Monroe Street"[26]

- Regarding an April 2013 stay at the Motel 6 in Sacramento, California, a customer wrote: "Caters to prostitutes and johns. If you're a prostitute or john you'll love this Motel 6… Don't bother calling Guest Reservations either, because they'll say they can't do anything…"[27]

- Regarding a September 2019 stay at the Motel 6 in Birmingham, Alabama, a customer wrote: "I didn't like the idea of the drug trafficking and prostitution that was allowed by staff"[28]

133.    The Motel 6 at issue here received online reviews showing customer after customer reporting sex trafficking on NNJP's property and G6 Hospitality and NNJP's failure to address, limit or prevent sex trafficking and compelled prostitution at its branded properties including that of Jane Doe #4.  For example:

- Regarding a June 2012 stay at the subject Motel 6, a customer wrote: "…I got two phone calls back to back from clients that had seen an escort the night before wanting [their] watch or money back, and then I got a knowck on the door with a guy wanting sex. I freaked out and called the front desk and they said well you can leave but no refunds…"[29]

- Regarding a June 2012 stay at the subject Motel 6, a customer wrote: "…if you are looking for drugs well look no farther! Just ask anyone after 10pm they are everywhere! need a

[25] Review of Motel 6 – Albany, Albany, New York (Oct. 27, 2017), available at https://www.tripadvisor.com/ShowUserReviews-g29786-d244131-r143824352-Motel_6_Albany-Albany_New_York.html.

[26] Review of Motel 6 Tallahassee West, Tallahassee Florida (Aug. 9, 2019), *available at* https://www.booking.com/reviews/us/hotel/tallahassee-2738-north-monroe-street.html.

[27] Review of Motel 6 Sacramento South, Sacramento, California (Apr. 23, 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g32999-d243533-r158549801-Motel_6_Sacramento_South-Sacramento_California.html.

[28] Review of Motel 6 Birmingham – Bessemer, Birmingham, Alabama (Sep. 2019), *available at* https://www.kayak.com/Birmingham-Hotels-Motel-6-Birmingham---Bessemer.113779.ksp#reviews.

[29] https://www.tripadvisor.com/Hotel_Review-g56701-d244388-Reviews-or55-Motel_6_Houston_North_Spring-Spring_Texas.html#REVIEWS

lady of the night no prob there and the good part they come to you all night long they are calling and knocking!"[30]

- Regarding an August 2014 stay at the subject Motel 6, a customer wrote: "Drug deals, hookers, and prank fire alarms being set off at 4am… Shortly after that, two aspiring rappers robbed a car full of tax payers at gunpoint just outside this dump…" and further noted that they lived close by and had "received a notification that this place was temporarily housing a recently released registered sex offender".[31]

- Regarding a January 2017 stay at the subject Motel 6, a customer wrote: "Needles, trash, and crackhead hookers… Hookers and crackheads all over. The other guests can't sleep because the crackheads spaz out in the halls… Doors slamming and people constantly in and out."[32]

- Regarding a November 2017 stay at the subject Motel 6, a customer wrote: "This cesspool is a neighborhood blight of crack hookers, heroin junkies, human traffickers, transients, dope dealers, and thieves. Blatant drug and prostitution crime bleeding over into the parking lot of the nice shopping center and endangering families from the neighborhoods all around it."[33]

134.    Given the clear and obvious use of the subject Motel 6 for sex trafficking, the Harris County Attorney's Office, in 2017, filed a nuisance civil lawsuit against the Motel 6 at issue here citing an unusual level of prostitution and criminal activity. "Court documents state that this location is notorious for harboring habitual criminal activity, including trafficking of persons, prostitution, promotion of prostitution, compelling prostitution, and illegal drug offenses…"[34]

135.    Nevertheless, G6 Hospitality continued to knowingly benefit from the rental of rooms being used to facilitate sex trafficking, including the trafficking of Jane Doe #4, on their property.

## VIII.   CAUSES OF ACTION

## A.  CAUSES OF ACTION AGAINST SALESFORCE

---

[30] *Id.*
[31] https://www.yelp.com/biz/motel-6-houston-north-spring-spring?adjust_creative=trivago&utm_campaign=yelp_feed&utm_medium=feed_v2&utm_source=trivago
[32] *Id.*
[33] *Id.*
[34] https://www.springhappenings.com/harris-county-files-suit-against-spring-motel-6-citing-unusual-level-of-prostitution-and-criminal-activity/

136.    During the period that Jane Doe #4 was trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager and operator of the platform and technology that allowed Backpage to traffic persons and promote prostitution of others including Jane Doe #4.

137.    Jane Doe #4 seeks to hold Salesforce accountable for its own, independent actions in the promotion of and benefit from prostitution and trafficking of persons including Jane Doe #4.

138.    Salesforce's own conduct establishes its liability under Chapter 98 and 98A by violating the underlying criminal offense(s) incorporated therein.

139.    Jane Doe #4 does not, in any way, seek to treat Salesforce as a publisher or speaker. Rather she is pursuing state law claims against Salesforce that do not implicate the Communications Decency Act, 47 U.S.C. § 230(c)(1).

1.  **FIRST CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE §98A**

140.    Jane Doe #4 incorporates all other allegations as if set forth in full herein.

141.    Section 98.002A(a) provides liability against a defendant who knowingly engages in the promotion of prostitution. Chapter 98A liability rests upon conduct defined by and offenses under Texas Penal Code Sections 43.03 (Promotion of Prostitution); and Section 43.04 (Aggravated Promotion of Prostitution).

142.    Section 43.03 (PROMOTION OF PROSTITUTION)[35] provides in pertinent part, "a person commits an offense if,… he or she knowingly…receives money or other property pursuant to an agreement to participate in the proceeds of prostitution."

---

[35] Plaintiff would note that prostitution is illegal in all of the United States, with limited exceptions in Nevada.

143.    Salesforce knowingly agreed to participate in the proceeds of prostitution,[36] through its contract with and services to Backpage. While Backpage directly participated in the prostitution itself, Salesforce's contract caused it to "knowingly receive money" from the proceeds of prostitution, as Backpage's role in prostitution was widely publicized and known to Salesforce.[37]

144.    Sec. 43.04 (AGGRAVATED PROMOTION OF PROSTITUTION) provides that "[a] person commits an offense if he knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes."

145.    Here, Salesforce knowingly owned the CRM platform, retained ultimate control of and managed the platform used to promote the prostitution of two or more prostitutes including, but not limited to, the following:

  a.  Backpage's contract with Salesforce was a subscription agreement providing access to Saleforce's platform;

  b.  Saleforce retained the right to review customer's use of such subscriptions at any time;

  c.  At all times Salesforce retained the right to alert authorities as to unlawful activity that existed on their platform; and

  d.  Salesforce retains the right to delete customer data at any time.

146.    Salesforce signed multiple contracts and accepted money from Backpage. When Salesforce accepted money from Backpage pursuant to the contracts, Salesforce agreed to receive money pursuant to an agreement to participate in the proceeds of prostitution.

---

[36] There is no credible argument that Salesforce did not know that Backpage was engaged in the promotion of prostitution, as even a simple Google search would have shown as much.
[37] To the extent Salesforce argues it did not know of Backpage's role in human trafficking (with which Plaintiff disagrees), Backpage's facilitation of prostitution was known by Salesforce at all relevant times.

147.    Plaintiff's claim under Tex. Civ. Prac. & Rem. Code 98A seeks to hold Salesforce accountable for its own direct conduct in the promotion of prostitution and in accepting money pursuant to an agreement to participate in the proceeds of prostitution.

148.    For the reasons described above, Salesforce's acts, omissions, and commissions, taken separately and/or together constitute violations of Texas Civil Practice and Remedies Code § 98A.002 and Section 43 of the Texas Penal Code as incorporated therein, as Salesforce engaged in and benefitted from the "promotion of prostitution" generally and specifically with respect to Jane Doe #4.

149.    For all of the reasons stated herein, Jane Doe #4's claims and allegations do not implicate the Communications Decency Act, 47 U.S.C. § 230(c)(1).

## 2.    SECOND CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE §98

150.    Jane Doe #4 incorporates all other allegations as if set forth in full herein.

151.    Section 98.002(a) provides that "[a] defendant who engaged in the trafficking of persons or who intentionally or knowingly benefits from participating in a venture that trafficks another person is liable to the person trafficked."

152.    Therefore, Section 98 establishes both direct liability for those who engage in the trafficking of persons as well as beneficiary liability for those who knowingly benefit from participation in a venture that traffics another person.

153.    Salesforce's acts, omissions, and commissions, taken separately and/or together constitute "trafficking of persons" as defined by Texas Civil Practice and Remedies Code § 98.001 because Salesforce's conduct constitutes an offense under Chapter 20A of the Texas Penal Code.

154.     More specifically, as described above and incorporated herein, Salesforce's conduct constitutes an offense under both Section 43.03 and 43.04 of the Texas Penal Code, which are both incorporated and listed in Chapter 20A.  Tex. Penal Code Ann. § 20A.02(a).

155.     Because Plaintiff's claim under Tex. Civ. Prac. & Rem. Code § 98 seeks to hold Salesforce accountable for its own direct conduct in the trafficking of Jane Doe #4, her claims and allegations do not implicate the Communications Decency Act, 47 U.S.C. § 230(c)(1).

156.     Furthermore, Salesforce received a knowing benefit by selling licences and accepting proceeds of prostitution in payment for those products, subscriptions and service.

157.     For the reasons described above, Salesforce's acts, omissions, and commissions, taken separately and/or together constitute violations of Texas Civil Practice and Remedies Code § 98.002, as Salesforce engaged in and benefitted from the "trafficking of persons," as defined by § 98.001 and Section 20A of the Texas Penal Code as incorporated therein, generally and specifically with respect to Jane Doe #4.

## B.  CAUSES OF ACTION AGAINST BACKPAGE

158.     Jane Doe #4 seeks to hold Backpage accountable for its own, independent actions in the promotion of and benefit from prostitution and trafficking of persons, including Jane Doe #4.  She does not, in any way, seek to treat Backpage as a publisher or speaker. Therefore, Jane Doe #4's state law claims against Backpage do not implicate the Communications Decency Act, 47 U.S.C. § 230(c)(1).

### 1.  FIRST CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE §98A

159.     Jane Doe #4 incorporates all other allegations as if set forth in full herein.

160.     Section 98.002A(a) provides liability against a defendant who knowingly engages in the promotion of prostitution.

161.        Section 43.03 (PROMOTION OF PROSTITUTION)[38] provides in pertinent part, "a person commits an offense if, acting other than as a prostitute receiving compensation for personally rendered prostitution services, he or she knowingly…receives money or other property pursuant to an agreement to participate in the proceeds of prostitution."

162.        Here, Backpage, by accepting money from traffickers and the sellers of sex, had an agreement to participate in the proceeds of prostitution.

163.        Sec. 43.04 (AGGRAVATED PROMOTION OF PROSTITUTION) provides that "[a] person commits an offense if he knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes."

164.        Here, Backpage invested in, financed, controlled, supervised, and managed a prostitution enterprise that used two or more prostitutes, including Jane Doe #4.

165.        Because Plaintiff's claim under Tex. Civ. Prac. & Rem. Code 98A seeks to hold Backpage accountable for its own direct conduct in the promotion of prostitution, this claim is not subject to CDA protection.

166.        For the reasons described above, Backpage's acts, omissions, and commissions, taken separately and/or together constitute violations of Texas Civil Practice and Remedies Code § 98A.002, as Backpage engaged in and benefitted from the "promotion of prostitution."

**2.  SECOND CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE §98**

167.        Jane Doe #4 incorporates all other allegations as if set forth in full herein.

---

[38] Plaintiff would note that prostitution is illegal in all of the United States, with limited exceptions in Nevada.

168.     Section 98.002(a) provides that "[a] defendant who engaged in the trafficking of persons or who intentionally or knowingly benefits from participating in a venture that traffics another person is liable to the person trafficked."

169.     Therefore, Section 98 establishes both direct liability for those who engage in the trafficking of persons as well as beneficiary liability for those knowingly benefit from participation in a venture that traffics another person.

170.     Backpage's acts, omissions, and commissions, taken separately and/or together constitute "trafficking of persons" as defined by Texas Civil Practice and Remedies Code § 98.001 because Salesforce's conduct constitutes an offense[39] under Chapter 20A of the Texas Penal Code.

171.     More specifically, as described above, Backpage's conduct constitutes an offense under both Section 43.03 and 43.04 of the Texas Penal Code, which are both incorporated and listed in Chapter 20A. Tex. Penal Code Ann. § 20A.02(a)

172.     Because Plaintiff's claim under Tex. Civ. Prac. & Rem. Code § 98 seeks to hold Backpage accountable for its own direct conduct in the trafficking of Jane Doe #4, this claim is not subject to CDA protection.

173.     For the reasons described above, Backpage's acts, omissions, and commissions, taken separately and/or together constitute violations of Texas Civil Practice and Remedies Code § 98.002, as Backpage engaged in and benefitted from the "trafficking of persons" as defined by § 98.001.

## C.  CAUSES OF ACTION AGAINST G6 HOSPITALITY

---

[39] Texas Civil Practice and Remedies Code § 98.002(b) provides that "it is not a defense to liability under this chapter that a defendant … has not been prosecuted or convicted under Chapter 20A." Tex. Civ. Prac. & Rem. Code Ann. § 98.002(b).

1.      FIRST CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE § 98.002

174.     Jane Doe #4 incorporates all other allegations as if set forth in full herein.

175.     G6 Hospitality's acts, omissions, and commissions, taken separately and/or together outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002. Specifically, G6 Hospitality had a duty not to knowingly benefit from trafficking of persons, including Jane Doe #4. At all relevant times, G6 Hospitality breached this duty by knowingly benefitting from the facilitation of trafficking minors, including Jane Doe #4, by acts and omissions including, but not limited to:

a.      Profit from renting rooms to those looking to sexually exploit Jane Doe #4 and other human trafficking victims;

b.      Increased profit margins due to lower operation cost by refusing to implement proper training of G6 Hospitality's employees and managers regarding the signs of human trafficking and the exploitation of minors;

c.      Increased profit margins due to lower operation cost by refusing to hire qualified security officers who would actively combat human trafficking and the exploitation of minors;

d.      Increased profit margins as a result of continued customer loyalty by child molesters and johns who sought to exploit minors, including Jane Doe #4, due to G6 Hospitality's lack of measures against the exploitation of minors and human trafficking. This customer loyalty lead to continued alcohol, food, and room sales;

e.      Increased profit margins as a result of presenting a more "marketable brand" to child molesters and johns looking to exploit minors–which in turn leads to higher alcohol, food, and room sales when these child molesters and johns visit G6 Hospitality's property; and

f.      Increased profit margins by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against human trafficking and the exploitation of minors or take active security measures to prevent human trafficking and the exploitation of minors on their property.

176.     As described throughout this petition and above, G6 Hospitality has received financial benefits in the form of management fees, licensing fees, and rental fees from the rental of its rooms.  With knowledge of the atrocities occurring on their properties, G6 hospitality kept receiving benefits from the rental of its rooms.  As a result of its choice to receive such benefits, many victims, including Jane Doe #4, were trafficked and exploited on the properties of G6 Hospitality.

177.     Moreover, G6 Hospitality knowingly benefited from the specific exploitation and trafficking of Jane Doe #4 on numerous occasions by receiving payment for rooms in which Jane Doe #4 was exploited at the G6 Hospitality location.

178.     As a result of the acts, omissions, and/or commissions alleged in this pleading, G6 Hospitality knowingly benefited from participating in a venture with Backpage and Traffickers who trafficked "other persons" including Jane Doe #4 at G6 Hospitality locations.

179.     Therefore, G6 Hospitality violated Texas Civil Practice and Remedies Code § 98.002 with respect to Jane Doe #4 and is responsible for the injuries and damages arising from her being trafficked.

2.     SECOND CAUSE OF ACTION—NEGLIGENCE

180.     Jane Doe #4 incorporates all other allegations as if set forth in full herein.

181.     G6 Hospitality had a duty of care to operate each of their hotels in a manner that did not endanger minor children, including Jane Doe #4.  Moreover, G6 Hospitality had a duty of care to take reasonable steps to protect the foreseeable victims of the danger created by their acts and omissions, including the danger created by G6 Hospitality of human trafficking

and exploitation of minors due to G6 Hospitality fostering an environment that encouraged this behavior.

182.     G6 Hospitality breached the foregoing duties because they knew, or should have known, that adults working as sex traffickers were causing by any means minors, including Jane Doe #4, to be exploited and trafficked at G6 Hospitality's hotel on a repeated basis. Despite this knowledge, G6 Hospitality accepted the unspoken financial benefit mentioned above of allowing human trafficking and the exploitation of minors to occur at their hotels and failed to take reasonable steps to protect children from being trafficked or exploited, including Jane Doe #4.

183.     G6 Hospitality failed to act as a reasonably prudent hotel franchisor and was negligent, at a minimum, through the acts described above and incorporate herein  by reference.

184.     As a direct and proximate result of G6 Hospitality's wrongful acts and omissions, Jane Doe #4 suffered, and continues to suffer, severe injuries and damages.

### 3.     THIRD CAUSE OF ACTION— GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

185.     Jane Doe #4 incorporates all other allegations as if set forth in full herein.

186.     G6 Hospitality's acts and omissions constitute gross neglect, recklessness and willful and wanton conduct resulting in the injuries and damages suffered by Jane Doe #4 and others similarly trafficked at G6 Hospitality locations.

187.     Viewed objectively from the standpoint of G6 Hospitality at the time of the incidents, G6 Hospitality's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Jane Doe #4 and others similarly trafficked at G6 Hospitality locations.

188.     Nevertheless, G6 Hospitality demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including Jane Doe #4.

189.     Exemplary damages are warranted for G6 Hospitality's gross negligence, recklessness and willful and wanton conduct.

## D. CAUSES OF ACTION AGAINST NNJP

### 1. FIRST CAUSE OF ACTION—VIOLATION OF TEXAS CIVIL PRACTICE & REMEDIES CODE § 98.002

190.     Jane Doe #4 incorporates all other allegations as if set forth in full herein.

191.     NNJP acts, omissions, and commissions, taken separately and/or together outlined above constitute a violation of Texas Civil Practice and Remedies Code § 98.002. Specifically, NNJP knowingly benefited from the trafficking of persons, including minors such as Jane Doe #4, at 19606 Cypresswood Court Spring, Texas during February 2014 and violated Chapter 98 by acts and omissions including, but not limited to:

    a.    Profit from renting rooms to those looking to sexually exploit Jane Doe #4 and other human trafficking victims;

    b.    Increased profit margins due to lower operations cost by refusing to install proper security devices in NNJP's lobby, hallways, and parking lots that would help (a) deter human trafficking and the sexual exploitation of minors and (b) be used to identify potential human trafficking and the sexual exploitation of minors and alert the proper authorities and/or intervene in an appropriate way;

    c.    Increased profit margins due to lower operations cost by refusing to install adequate lighting and security cameras to monitor ingress and egress of human traffickers and suspicious males looking to exploit minors on NNJP's property;

    d.    Increased profit margins due to lower operation cost by refusing to implement proper security measures to prevent the exploitation of minors at NNJP's property;

    e.    Benefit of avoiding law enforcement officials and spending the time to address and properly solve human trafficking and the exploitation of minors on NNJP's premises. This prevented NNJP from having to spend time and money filing out all proper and necessary law enforcement reports and information as well as responding to proper and necessary subpoena requests; and

f.   Increased profit margins by knowingly catering to the needs of a criminal sub-culture that is looking for locations that will not actively enforce laws against human trafficking and the exploitation of minors or take active security measures to prevent human trafficking and the exploitation of minors on their property.

192.   As a result of the acts, omissions, and/or commissions alleged in this pleading, NNJP knowingly benefited from participating in a venture with Backpage and Traffickers who trafficked "other persons" including Jane Doe #4 at their 19606 Cypresswood Court Spring, Texas location.

193.   Therefore, NNJP violated Texas Civil Practice and Remedies Code § 98.002 with respect to Jane Doe #4 and is responsible for the injuries and damages arising from her being trafficked.

194.   As described throughout this petition and above, NNJP has received financial benefits in the form of room rentals as a result of these acts and/or omissions by continuing to turn a blind eye to human trafficking and the exploitation of minors to keep security and operating cost low while maintaining the loyalty to the segment of their customer base that seek to exploit minors, including Jane Doe #4.

195.   Moreover, NNJP knowingly benefited from the exploitation and trafficking of Jane Doe #4 on numerous occasions by receiving payment for rooms in which Jane Doe was brutally and repeatedly abused at NNJP's location. These acts, omissions, and/or commissions alleged in this pleading were the producing and proximate cause of Jane Doe #4 injuries and damages.  Therefore, NNJP is in violation of Texas Civil Practice and Remedies Code § 98.002.

## 2.   SECOND CAUSE OF ACTION—NEGLIGENCE

196.   Jane Doe #4 incorporates all other allegations as if set forth in full herein.

197.   NNJP had a duty of care to operate each of their hotels in a manner that did not endanger minor children, including Jane Doe #4.  Moreover, NNJP had a duty of care to

take reasonable steps to protect the foreseeable victims of the danger created by their acts and omissions, including the danger created by NNJP of human trafficking and exploitation of minors due to NNJP fostering an environment that encouraged this behavior.

198.    NNJP breached the foregoing duties because they knew, or should have known, that adults working as sex traffickers were causing by any means minors, including Jane Doe #4, to be exploited and trafficked at NNJP property on a repeated basis.  Despite this knowledge, NNJP accepted the unspoken financial benefit mentioned above of allowing human trafficking and the exploitation of minors to occur at their hotels and failed to take reasonable steps to protect children from being trafficked or exploited, including Jane Doe #4.

199.    NNJP failed to act as a reasonably prudent hotel franchisor and was negligent, at a minimum, through the acts described above and incorporate herein by reference.

200.    As a direct and proximate result of NNJP's wrongful acts and omissions, Jane Doe #4 suffered, and continues to suffer, severe injuries and damages.

### 3.    THIRD CAUSE OF ACTION— GROSS NEGLIGENCE, RECKLESSNESS, WILLFUL AND WANTON CONDUCT

201.    Jane Doe #4 incorporates all other allegations as if set forth in full herein.

202.    NNJP's acts and omissions constitute gross neglect, recklessness and willful and wanton conduct resulting in the injuries and damages suffered by Jane Doe #4 and others similarly trafficked at NNJP hotel locations.

203.    Viewed objectively from the standpoint of NNJP at the time of the incidents, NNJP's acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Jane Doe #4 and others similarly trafficked at NNJP hotel locations.

204.     Nevertheless, NNJP demonstrated an utter indifference to or conscious disregard for a person's safety or the safety of others, including Jane Doe #4.

205.     Exemplary damages are warranted for NNJP 's gross negligence, recklessness and willful and wanton conduct.

## E.  CAUSES OF ACTION ALL PARTIES

### 1.   FIRST CAUSE OF ACTION—JOINT AND SEVERAL LIABILITY UNDER CIVIL PRACTICE & REMEDIES CODE § 98.005

206.     Defendants' conduct violated Texas Civil Practice & Remedies Code § 98.005. Therefore, each of the Defendants is jointly and severally liable for the entire amount of damages awarded by a jury in this case under Texas Civil Practice & Remedies Code § 98.005.

## IX.   <u>DAMAGES</u>

207.     Plaintiff adopts and re-alleges each paragraph above as if set forth herein. Including the damages specifically alleged above, Jane Doe #4 seeks the following damages from all Defendants.

## A.   Damages for Violation of Texas Civil Practice and Remedies Code § 98.002 and §98A Against Defendants.

208.     Plaintiff prays for all damages as allowed under Texas law including Texas Civil Practice & Remedies Code including, but not limited to:

a.     actual damages;

b.     mental anguish;

c.     court cost;

d.     reasonable attorney's fees; and

e.     exemplary damages

209.     Plaintiff seeks the award of exemplary damages against Defendants as recoverable under Texas law.

210.     Plaintiff also requests that the Court award pre-judgment and post-judgment interest in accordance with the prevailing rates of interest under Texas law.

**B.     Exemplary Damages Unrestricted for all Defendants for Violations of Texas Civil Practice and Remedies Code § 41.008(c).**

211.     Defendants' acts, omissions, and/or commissions outlined above constitute a knowing violation of Texas Penal Code § 22.04. Therefore, under Texas Civil Practice & Remedies Code **§** 41.008(c) exemplary damages are unlimited.

## X.     <u>JURY DEMAND</u>

In accordance with Rule 216 of the Texas Rules of Civil Procedure, Plaintiff hereby makes application for a jury trial and request that this cause be set on the Court's Jury Docket.  In support of her application, the appropriate jury fee has been paid to the Clerk at least thirty-days (30) in advance of the trial setting.

## <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff prays that this case be set for trial before a jury, and that upon a final hearing of the cause, judgment be entered for Plaintiff against Defendants jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Plaintiff may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

By: */s/ Annie McAdams*
  **ANNIE MCADAMS PC**
  **Annie McAdams**
  Texas Bar No. 2405104
  1150 Bissonnet
  Houston Texas 77005
  Phone: 713-785-6262
  Fax: 888-713-0451
  annie@mcadamspc.com
   and
  **SICO HOELSCHER HARRIS LLP**
  **David E. Harris**
  Texas Bar No. 24049273
  802 N. Carancahua, Suite 900
  Corpus Christi, Texas 78401
  Phone: 361-653-3300
  Fax: 361-653-3333
  dharris@shhlaw.com
   and
  **THE GALLAGHER LAW FIRM**
  **Michael T. Gallagher**
  Texas Bar No. 07586000
  **Pamela McLemore**
  Texas Bar No. 24099711
  2905 Sackett Street
  Houston, Texas 77098
  Phone: 713-222-8080
  Fax: 713-222-0066
  mike@gld-law.com
  pamm@gld-law.com
  **ATTORNEYS FOR PLAINTIFF**